## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CALVIN BOWMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action Number** |
| **v.** | ) | **2:18-cv-00364-AKK** |
| | ) | |
| **THE CITY OF BIRMINGHAM** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Calvin Bowman, proceeding *pro se*, asserts retaliation claims under Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), against the City of Birmingham. Doc. 29. More specifically, Bowman alleges that the City retaliated against him through five discrete acts after he filed a prior lawsuit against the City and two employees, *see Bowman v. City of Birmingham, et al.*, No. 2:17-cv-00255-AKK ("*Bowman III*"). The City has now moved for summary judgment arguing, among other things, that the alleged retaliatory acts fail to rise to an adverse action, and that Bowman cannot show that the City's articulated reasons for the challenged conduct are pretextual. *See* doc. 32. For his part, Bowman has moved for partial summary judgment on two of the five discrete acts of retaliation – the threat of termination and a written reprimand. *See* doc. 35. Based on the

1

evidence and consideration of relevant law, Bowman's motion is due to be denied, and the City's motion is due to be granted except as to the written reprimand.

## I. MOTIONS TO STRIKE

The court turns first to the parties' motions to strike evidence, docs. 41 and 49, they each rely on in support of their respective summary judgment motions. The court sets aside the somewhat unsettled question of whether a motion to strike is the procedurally correct vehicle to challenge an evidentiary attachment to a motion. *See Jeter v. Montgomery Cty.*, 480 F. Supp. 2d 1293, 1296 (M.D. Ala. 2007) (declining to strike exhibits because motions to strike are only properly granted with respect to pleadings). *But see Thomas v. Ala. Counsel on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1112 (M.D. Ala. 2003) (explaining that "[a]ffidavits which fail to meet the standards set forth in Rule 56(e) may be subject to a motion to strike"). Regardless of whether a motion to strike is proper here, the court may only consider the evidence so long as "the statement[s] could be reduced to admissible evidence at trial." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Given that the court's role at summary judgment is to require the non-movant to show "that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue of material fact exists," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), there is a difference between considering evidence that does not strictly

conform to the rules of evidence, at least as presented, but has some probative value and a statement that lacks any indicia of reliability at all.

### A. The City's Motion

The City moves to strike portions of Bowman's November 2018 affidavit, doc. 36 at 29, asserting that paragraphs 12-18 reference statements that are "private, confidential, and privileged from process and discovery" pursuant to the court's mediation order, doc. 33-1, and Federal Rule of Evidence 408, and that paragraphs 13-15 and 17-18 contain inadmissible hearsay. Doc. 41. Although the City is correct that mediation proceedings are generally confidential, the bulk of the statements in Bowman's affidavit reference matters that are in the record independent of the mediation proceeding – paragraph 12 references the parties engaging in a second mediation, *see* doc. 33 in *Bowman III*; paragraphs 13, 14, 16 reference Bowman's violations of the City's email policies, *see* docs. 33-2 and 33-3; and paragraph 18 references Bowman's personal observation of alleged violations of the City's computer policies which he later describes in his December 2018 affidavit, *see* doc. 47-1.

The City notes correctly, however, that paragraphs 15 and 17 reference comments the mediator purportedly relayed to Bowman from the *Bowman III* defendants, in particular that these individuals threatened to discharge Bowman if he rejected their settlement offer. Generally, the disclosure of the specific

settlement offer would violate the mediation order and Rule 408's protection of confidential negotiations. However, the comment is prominently featured in Bowman's complaint and amended complaints, docs. 1 at 35, 2 at 35, and 29 at 7, and are already in the public record. Moreover, although the Eleventh Circuit has not ruled on this issue precisely, other circuit courts have held that Rule 408 does not exclude negotiation statements of "alleged threats to retaliate for activity protected" which "serve to prove liability . . . for making . . . the threats," *see Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1294 (6th Cir. 1997), or negotiation statements that "involved a different claim than the one at issue in the current trial," *see Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992).[1]

Nonetheless, Bowman must still demonstrate that the discharge threats satisfy a hearsay exception. Because paragraphs 15 and 17 contain hearsay within hearsay (i.e. the mediator's relay of the defendants' purported statements), the court must determine if "each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. The mediator's statement to Bowman about the City's purported threats to discharge him fails to satisfy any hearsay exception. The court is not convinced by Bowman's contention that the mediator's

---

[1] The alleged threats in *Uforma* were not considered hearsay because the employer's human resources manager, who was able to testify at trial, directly told the employees about the alleged threat. 111 F.3d at 1287–88. Similarly, in *Broadcort Capital Corp.*, the witness who heard the statements directly from one of the negotiating parties testified at trial and the statements concerned settlement discussions related to a different claim. 972 F.2d at 1194.

statements are not hearsay under Federal Rule of Evidence 801(d)(2)(C) because "the City . . . authorized the mediator to make the statements" to Bowman. *See* doc. 43 at 3. A mediator is not by definition an agent of any party. Rather, the "mediator facilitates discussions among litigants to assist them in identifying the underlying issues and in developing a creative and responsive settlement package." *See* ALND Alternative Dispute Resolution Plan, Sec. IV Mediation. Similarly, Bowman's contention that the mediator's statements are not hearsay because he is offering them "solely for the purpose of proving that the statement (i.e., adverse action) was made, not for the truth of the statement," doc. 43 at 3, is unavailing. In light of Bowman's contention that the City retaliated against him by threatening him with termination, there is no other reason for him to offer the evidence except to establish the truth of what the mediator asserted. Therefore, because the mediator is unable to testify at trial, the statements are inadmissible. *United States v. Dotson*, 821 F.2d 1034, 1035 (5th Cir. 1987) ("The mere fact that one level of a multiple-level statement qualifies as 'nonhearsay' does not excuse the other levels from rule 805's mandate that each level satisfy an exception to the hearsay rule for the statement to be admissible."). Accordingly, Bowman's references to the specific settlement offer terms and the alleged threat to discharge Bowman are due to be stricken. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005)

("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.").

### B. Bowman's Motion

Bowman moves to strike new arguments regarding a pay increase the City raises in its reply brief. Doc. 49. The City contends that it did not raise this argument initially because Bowman failed to plead in his second amended complaint that the City denied him a pay raise for violating the City's computer policy, and only raised this contention in his response to the City's motion. Doc. 50. Bowman is correct that, generally, "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *United States v. Coy*, 19 F.3d 629, 632 n. 7 (11th Cir. 1994). However, in his second amended complaint, Bowman alleges broadly that the City issued him a written reprimand, among other retaliatory acts, which collectively led to "pecuniary harm." Doc. 29 at 13. Bowman only described the alleged pecuniary harm — a purported a denial of a "5% pay raise . . . in October 2017" — in his response to the City's motion for summary judgment. Doc. 42 at 15. "Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Where, as here, Bowman waited until his summary judgment briefing to describe the pay issue, despite possessing the

information when he filed this lawsuit, the City properly used its reply brief to rebut Bowman's clarified contention that the written reprimand influenced Oates' decision to deny him a pay raise. *See San Francisco Residence Club, Inc. v. Baswell-Guthrie,* 897 F. Supp. 2d 1122, 1202 (N.D. Ala. 2012) (citing *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 975 (11th Cir. 2008)).

Bowman also moves to strike Faye Oates' December 2018 affidavit, doc. 46-1, contending that the City failed to obtain leave to file evidentiary materials after the deadline. Docs. 28 and 49. Upon review, paragraphs 1-4 of the affidavit reference testimony that Oates provided in a prior deposition about the Crossplex event assignment policy, and paragraphs 5-10 attempt to clarify why Bowman did not receive a pay raise in October or November 2017. Doc. 37-2 at 8. As explained above, the City properly used Oates' affidavit in its reply brief to rebut new arguments Bowman raised in his response brief. Accordingly, Bowman's motion to strike, doc. 49, is due to be denied.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v.*

*Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

The simple fact that both parties have filed partial motions for summary judgment does not alter the ordinary standard of review. *See Chambers & Co. v. Equitable Life Assurance Soc.*, 224 F.2d 338, 345 (5th Cir. 1955) (explaining that cross-motions for summary judgment "[do] not warrant the granting of either motion if the record reflects a genuine issue of fact"). Rather, the court will consider each motion separately "'as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017) (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004)). The court notes that although cross-motions "'may be probative of the non-existence of a factual dispute'" they "'will not, in themselves, warrant [the granting of] summary judgment.'" *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).

## III. FACTUAL BACKGROUND

Since 1999, Bowman has worked for the City as an accountant and more recently as a business officer in its Crossplex Department. Doc. 42 at 36. In February 2017, Bowman filed his third lawsuit[2] against the City. *Id.* at 37. During their second mediation session in October 2017, Bowman became upset over the City's settlement offer and purported threat to discharge him. *Id.* at 38. Bowman argues that the City engaged in four other discrete acts of retaliation allegedly in response to his rejection of the settlement offer — (1) a little over a week after mediation, the City issued Bowman, through his supervisor Faye Oates (Director of the Birmingham Crossplex), a written reprimand for violating the City's computer use policy.[3] Docs. 33-3, 33-5 at 2, 37-1 at 9, 33-4 at 7; (2) under its assignment policy,[4] the City denied Bowman the opportunity to work at events as a maintenance manager. Docs. 33-4 at 13-15, 46-1 at 17-18; (3) the City denied

---

[2] Bowman sued the City in 2004, *see Bowman v. City of Birmingham*, 2:04-CV-03487-RDP ("*Bowman I*"), and in 2010, *see Bowman v. City of Birmingham*, 2:10-CV-00483-PWG ("*Bowman II*").

[3] Executive Order #72-95 dated February 2010 prohibits employees from using City equipment "to access non-business related internet sites to conduct personal business or for personal entertainment." Doc. 33-2 at 1. Although the policy did not prohibit "occasional personal use," it prohibited employees from using computers that "interfere with the City activities and responsibilities" or "performance of personnel duties." *Id.* at 3. In Bowman's case, Jarvis Patton (the City's Chief of Operations) discovered in preparation for mediation that Bowman had scanned personal documents at work and was emailing the City's attorney about his third lawsuit.

[4] The Crossplex consists of three venues – a pool, a track, and an arena that are used for athletic events. In October 2016, Oates established a policy that if "anyone on the CrossPlex staff is going to work outside of their duties [during events], they have to have a post" and formally "sign up as an event worker." Doc. 37-2 at 7-8. The City utilizes this event worker signup sheet to staff events at the Crossplex. *Id.*

Bowman the opportunity to work as "Overall Manager" during events. Docs. 33-4 at 14, 46-1 at 23; and (4) after initially assigning Bowman to work as a cashier at the 2018 NCAA Indoor Track & Field Championship, the City informed Bowman that it no longer needed him for the event due to lower than projected attendance rates and ticket sales. Doc. 46-1 at 18, 20-21. These alleged retaliatory acts are the basis for this lawsuit.

## IV. ANALYSIS

The City has moved for summary judgment fully, doc. 32, and Bowman has moved on two of the five alleged retaliatory acts – the threats to discharge him and issuance of a written reprimand regarding misuse of work computers, doc. 35. However, because Bowman's contention regarding the discharge threat is based on inadmissible hearsay, this claim fails.[5] As such, the court will only consider the City's motion on the four remaining acts and Bowman's motion on the written reprimand.

---

[5] Moreover, unrealized threats of discharge do not constitute adverse actions when they cause no objective change in employment. *See Van Der Meulen v. Brinker Int'l,* 153 F. App'x 649, 655 (11th Cir. 2005). Bowman devotes a substantial portion of his amended complaint describing how the threat caused him "emotional distress, mental anguish, and severe sleeplessness" which led to a "physical injury" and "diagnosis of depression." Doc. 29. Subjective allegations of personal suffering "[do] not suffice for a showing of the requisite adverse action, despite the high significance [Bowman] may personally attribute to it." *Ewing v. Moore*, No. 7:17-CV-00743-LSC, 2018 WL 3852297, at *7 (N.D. Ala. Aug. 13, 2018); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69, (2006) ("An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.").

Title VII prohibits employers from retaliating against employees who oppose an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Where, as here, the evidence of retaliation is entirely circumstantial, the burden of proof shifts between the employee and employer according to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), analytical framework. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). Initially, the employee must show: (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action would not have occurred but for the protected activity. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). If the employee establishes a *prima facie* case, the burden shifts to the employer to "proffer a legitimate, non-discriminatory reason for the adverse employment action," but this burden is "exceedingly light." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989)). If the defendant meets its burden, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

## A. Whether Bowman Established a Prima Facie Case

The parties agree that Bowman engaged in a statutorily protected activity by filing *Bowman III*. *See Gerard v. Board of Regents of State of Ga.*, 324 Fed. Appx. 818, 825 (11th Cir. 2009) ("Statutorily protected expression includes internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits."). Therefore, the crux of the dispute hinges on whether Bowman can satisfy the adverse employment action and casual relation prongs of the *prima facie* case.

### 1. Whether Bowman suffered an adverse action

An adverse employment action requires that the employee "show either ultimate employment decision, i.e. termination, failure to hire, or demotion, or, for conduct falling short of ultimate employment decision, *serious and material* change in terms, conditions or privileges of employment." *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) (emphasis in original). When an employee alleges "discrete acts" of retaliation, "each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). "The court assesses whether an employment action is materially adverse by deciding whether a reasonable person would have found it materially adverse; a plaintiff's subjective opinion about the employment action does not control the assessment." *Jones v.*

*City of Birmingham*, No. 2:16-CV-01121-RDP, 2018 WL 2735636, at *5 (N.D. Ala. June 7, 2018).

In arguing that Bowman cannot show an adverse action, the City focuses solely on the written reprimand. Doc. 34 at 11-12. However, Bowman alleges also that he suffered adverse employment actions through a denial of a five percent pay raise, management roles, and a cashier assignment. Doc. 29. The City does not challenge these contentions on adverse action grounds. As a result, even if the City is correct that the reprimand is not an adverse action,[6] when the reprimand is considered in conjunction with Bowman's other unchallenged contentions, Bowman has in fact satisfied the adverse action prong. *See Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (While individual actions "might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action.").

### 2. Whether Bowman has established that the adverse actions are causally related to his protected activity

To satisfy the causation element, Bowman must prove that but-for the City's desire to retaliate, he would not have suffered the adverse employment actions.

---

[6] While the City is generally correct that a "reprimand . . . does not constitute an adverse employment action when the employee suffers no tangible harm as a result," *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001), Bowman maintains that the written reprimand resulted in an "eight-month loss of a pay raise." *See* docs. 36 at 29 and 46-1.

*Booth v. Pasco Cnty.,* 757 F.3d 1198, 1207 (11th Cir. 2014) (citing *Nassar*, 570 U.S. at 363). A plaintiff can prove causation through "sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse . . . action." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (citation omitted).

Bowman has made this showing. Specifically, Patton discovered Bowman's misuse of the City's computers and email for his personal lawsuit when preparing for the mediation in *Bowman III*. Thereafter, Patton shared his findings with Bowman's direct supervisor, and she, in turn, issued the written reprimand a little over a week later and engaged in the other retaliatory acts within a few months of the mediation. Because of Patton's awareness of the protected activity and the short timeframe between the mediation and the adverse actions, Bowman has sufficiently created a presumption of causation to establish a *prima facie* case.

## B. Whether the City Offers Legitimate Non-Discriminatory Reasons and Bowman Demonstrates Pretext

"Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). The court will address next the parties' respective contentions for each alleged retaliatory act. Doc. 34 at 14-17.

*1. Written Reprimand*

The City asserts it issued the written reprimand because Bowman violated former Mayor William A. Bell's memorandum that instructed City employees that use of internet, computer, electronic equipment and email is "authorized for official business only." Doc. 33-2 at 2. Employees who "violate these policies will be subject to disciplinary actions, up to and including employment termination." *Id.* Indeed, Bowman concedes that he used his City computer and email to send personal emails to the City's attorney about the *Bowman III* lawsuit. *See* docs. 37-1 at 8-11, 37-2 at 12-14, and 33-4 at 7-8 ("No, I don't deny that I sent you emails . . . [from] my City email."). Viewed in this light, the City has met its burden of showing that it issued the reprimand for legitimate, non-retaliatory reasons.

Therefore, the burden shifts to Bowman to show pretext. *Alvarez*, 610 F. 3d. at 1264. "A reason is not pretext for discrimination 'unless it is shown both that the reason was false, *and* that discrimination was the real reason.'" *Brooks v. Cnty. Com'n of Jefferson Cnty.*, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis added). Moreover, Bowman cannot recast the proffered reason but "must meet it head on and rebut it," showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale." *Trigo v. City of Doral*, 663 Fed. App'x 871, 873 (11th Cir. 2016) (citing *Holland v. Gee*, 677 F.3d

1047, 1055-56 (11th Cir. 2012)).  If Bowman fails to demonstrate a genuine dispute as to a material fact regarding pretext, the City is entitled to summary judgment.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

To show pretext, Bowman maintains that several other employees violated the same policy without facing any discipline.  Doc. 42 at 19-24. "While a plaintiff can attempt to meet his burden of showing pretext with evidence that other employees were treated differently despite engaging in similar acts as the plaintiff, the plaintiff must show that the other employees are similarly situated to the plaintiff in all relevant respects." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008) (citation omitted).  "[T]o determine whether employees are similarly situated, [the court] evaluate[s] whether the employees are involved in or accused of the same or similar conduct and are disciplined [by the same decision maker] in different ways." *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 805).

### a. Faye Oates

Bowman testified that he "periodically observed Faye Oates watching YouTube videos on her City computer between 2014 and 2017," doc. 42 at 39. The reliance on Oates is flawed for multiple reasons.  As an initial matter, there is a difference between "periodically" watching YouTube videos and Bowman's alleged conduct of using his City computer and email to send a binder full of

emails and attachments about his personal lawsuit. Indeed, Bowman does not explain how Oates' conduct falls outside the exception for occasional personal use that is deemed as acceptable under the policy. Moreover, there is no evidence that Patton knew about Oates' conduct other than Bowman's contention that he told Patton about it *during* the mediation in response to the purported threat to discharge him. *Id.* at 39-40. *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 n. 5 (11th Cir. 2003) (finding that a supervisor must have actual knowledge of the misconduct for an employee to be considered similarly situated when comparing disciplinary actions). And even with Bowman's report to Patton, to the extent that the City has the ability to track down Oates' web history to ascertain whether she exceeded the allowed occasional personal use, Bowman has not presented any such evidence. Indeed, there is no evidence that the City can even capture data on websites a specific employee visited for the months preceding Bowman's complaint to Patton or as far back as 2014 when Bowman alleges he first observed Oates' conduct. In contrast, apparently the City can capture emails, as it maintains that Patton became directly aware of Bowman's conduct through emails that Bowman sent to the City's attorney in *Bowman III.* Therefore, on this record, Bowman has failed to establish that he is similarly situated to Oates.

b. Kim Jackson

Bowman claims next that Jackson used the City's copier for personal reasons. Specifically, Sandra Brown, an administrative supervisor in charge of payroll and timekeeping, testified about Jackson making copies and scanning documents on the City's copier for her personal business. Docs. 36 at 46; 42 at 22, 42. Bowman testified also that he periodically observed Jackson make copies of sales documents in the copier room and that in 2012 he reported Jackson to Kevin Moore, former director of the Crossplex, who purportedly did not discipline Jackson. Doc. 42 at 22, 78. The contentions against Jackson fall short of establishing that she is "similarly situated to [Bowman] in all relevant respects." *Rioux*, 520 F.3d at 1280. First, Bowman is charged with violating a policy related to internet/email usage. Doc. 33-2. According to the memorandum announcing the policy, the City implemented the policy to address concerns related to internet security breaches, spyware, and viruses: "Internet use brings the possibility of serious breaches to the security of confidential information, contamination to our system via viruses or spyware, and unnecessary distractions from our expected work and productivity." *Id.* at 2. The actual policy includes prefatory language stating, "The following policies deal with Internet, Intranet, Wide Area Network (WAN), e-mail, online services, and desktop computer policies." *Id.* at 4. Using a copier falls outside of the policy and the concerns it addressed. *See id*., *generally*.

Second, Bowman has failed to offer any evidence that Patton, who made the decision to discipline him, knew of Jackson's purported use of the copier for personal needs – assuming such practice is even prohibited. There is no evidence in the record that Moore forwarded Bowman's report about Jackson's misconduct to Patton. *See Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"). Finally, to the extent the policy related to internet/email usage covers copy machines, Bowman has also failed to present evidence that Jackson's personal use exceeded the occasional use permitted under the policy. Therefore, under this record, Bowman has failed to show that he is similarly situated to Jackson in all relevant respects. *See Burke-Fowler*, 447 F.3d at 1323.

### c. Tara Nix

Similar to Jackson, Bowman contends that he witnessed Nix use the City's copier to copy and scan documents to her City email for her rental property business, doc. 42 at 43-44, and that Sandra Brown also witnessed Nix grabbing copies related to rental properties at the copy machine, doc. 36 at 44-45. Again, the internet/email usage policy Bowman purportedly violated does not apply to copying machines. *See supra* at Section (B)(1)(b). Moreover, even if it did, Bowman reported his single observation of Nix using the copy machine in 2015 to

Oates who allegedly did not discipline Nix. Doc. 47-1 at 7. The one or two infractions Bowman and Brown cite are different from the documented multiple violations by Bowman, who concedes that he "prepared [multiple documents] at home on his personal computer and . . . attached [them] to a few of his [work] emails." Doc. 42 at 20. *See e.g. Curtis v. Broward Cty.*, 292 F. App'x 882, 884 (11th Cir. 2008) ("[Female employee] did not establish that [male employee] engaged in the same quantity of misconduct that she did, alleging that he hung up on a customer once or, at most, twice, while she had hung up on that customer four times."); *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (holding that a female employee was not similarly situated to three male employees because the male employees were involved in only a single incident of alleged misconduct, while the female employee committed "at least four policy violations"). Finally, Bowman fails to offer any evidence that Patton knew about Nix's misuse of the City's copier and failed to discipline her. Accordingly, Bowman's reliance on Nix to demonstrate pretext also fails.

### d. Bowman's Prior Computer Misuse

Lastly, Bowman maintains that the City's decision to discipline him is pretextual because he used the City's email in September 2010 to communicate with the City's attorney about a prior lawsuit, *Bowman II*, without any similar repercussions  Accepting Bowman's contentions as true, apparently, Bowman

spoke with Patton about this 2010 communication during his second lawsuit, and Patton "never told [Bowman] that [his] emails violated City policy, . . . never sought discipline, . . . and never threatened to terminate [his] employment with the City for those emails." Doc. 47-1 at 7. However, when Bowman violated the City's policy during *Bowman III* in 2017, Patton "called IMS [the City's internal computer department,] and asked them to provide . . . information from [Bowman's] City computer." Doc. 37-1 at 8-9. Bowman maintains that Patton only did so because Bowman named him as a defendant in *Bowman III.* As a result of this prepared audit report, which Patton describes as being "two inches thick" and Oates maintains it contained "a hundred pages of documents," Oates, under the direction of Patton, sent Bowman a written warning that Bowman should "cease and desist from using City equipment for personal use." *See* docs. 33-3 at 2; 37-1 at 9; 37-2 at 13. In light of Patton's alleged awareness of Bowman's misconduct in *Bowman II* and the City's failure to refute or explain why it took no disciplinary action against Bowman at the time, Bowman has provided circumstantial evidence to create a triable issue on whether the City's articulated reasons for issuing the reprimand is pretextual. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328–29 (11th Cir. 2011) ("the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's . . . intent.").

Bowman's own motion related to this reprimand is also due to be denied. An issue of fact exists regarding whether the 2017 misuse, unlike the 2010 use, far exceeded the occasional use permitted by the policy. Accordingly, Bowman's case will proceed to trial on the written reprimand claim, during which, among other things, Bowman will have to present evidence on how this reprimand qualifies as an adverse action.

### 2. Denial of Requests to be Maintenance Manager at Crossplex Events

The next alleged retaliatory act is the denial of the requests to work as maintenance manager at Crossplex events. More specifically, there are two events in question — December 30, 2017 when Bowman worked and a subsequent request a few weeks later that Oates denied. At issue here is Bowman's contention that he did not have to sign up to work at events in light of the temporary maintenance duties assigned to him.

As general background, in early 2017, Wayne Staton left his position as the maintenance supervisor of the Crossplex – a position which included many roles such as supervising the set-up crew, maintenance staff, and events staff. Doc. 36 at 66. Sometime later that summer, Oates assigned Ricky Lee some of Staton's duties including the supervision of the maintenance staff and needs for the department. Doc. 37-2 at 12-16. The City discharged Lee approximately five months later, and Oates asked Bowman and other employees to take over

temporarily some of Lee's job duties related to supervising the maintenance staff. *Id.* The City maintains that it never formally designated Bowman, or any of the other employees temporarily filling in the various roles of the maintenance staff, a maintenance manager title or Staton's and Lee's formal titles which included working at events. *Id.* at 15-16. As to Bowman, the City contends it assigned him only specific maintenance tasks dealing with Bowman's background in financial management. *Id.* Consequently, to the extent that Bowman wanted to work outside his normal duties at any of the events held at the Crossplex, the City asserts that Bowman needed to express his interest on the signup sheet as any other employee.

Bowman maintains that Oates' decision to assign him some of the duties of the maintenance manager entitled him automatically to work at all the events at the Crossplex. He adds that the City's refusal to grant him this right resulted in loss of "earning manager pay" at purportedly over fifty events. Doc. 42 at 25-30. To support his contention, Bowman maintains that (1) Oates asked him to handle everything maintenance related until the City hired someone permanent for the role, doc. 33-4 at 35; (2) email exchanges with Oates reveal that she assigned him responsibilities of hiring an electrician to address the electrical surge issues and to maintain the sewer system at the Crossplex, doc. 42 at 50-52; (3) the City did not require him to sign up for a formal event assignment post when Sandra Brown asked him to substitute for her as the events manager, docs. 42 at 28; 34 at 6; and

(4) Oates denied his request to work during an event to oversee an electrical issue but allowed another employee, who was also temporarily assigned some of the maintenance roles, to work during events.  Doc. 42 at 45.   For the reasons stated below, none of these contentions show that the City's articulated reasons are pretextual.

As an initial matter, Bowman has presented no evidence that Oates assigned him *all* the maintenance supervisor roles or duties or any of Staton's duties related to supervising set-up and event crews.  Doc. 36 at 66.  According to Oates, she "split duties up and assigned [the maintenance supervisor duties] to a few people." Doc. 37-2 at 15.   Bowman concedes this point and acknowledges that he was not the only "one to assume all of [the maintenance supervisor's] duties" and that he was in charge of some duties, including "making sure the repairs were done." *Id.* at 14.  *See also* doc. 33-4 at 10 (Bowman's deposition that: "Q. So let me ask you this. Were you told that you were literally going to *completely replace* Wayne Staton when he announced him leaving the CrossPlex or, as Ms. Oates testified, were you told that you were going to be given some of his responsibilities? Did you take on *every single one* of Mr. Staton's responsibilities or did Ms. Oates divide those responsibilities among more than you? A. She divided them. She gave me a portion, and I'm not -- I don't remember who else she gave the other portion to.").

Bowman also concedes that it was not clear whether the temporary duties he received required him to work during Crossplex events, testifying that Oates "never made a statement telling [him] to work events to cover maintenance . . . [and] she never made a statement telling [him] not to." *Id*. The issue of contention here stemmed from Bowman's decision to work during an event on Saturday, December 30, 2017, when he purportedly assumed that he needed to oversee the maintenance staff's work that day on the heating system. *Id.* When Oates learned that Bowman had worked that Saturday, Oates reminded Bowman of the event assignment policy, which apparently Bowman never signed up for, and Bowman replied that he "will not work anymore events." Docs. 37-2 at 16 (Bowman's stating "I decided to work to make sure we did not have any maintenance problem and to see exactly what the maintenance staff were doing during events . . . But as instructed, I will not work anymore events.") and 46-1 at 22 (Oates' testimony that "I do remember sending you an e-mail about working a post. When I assigned you to serve as the liaison, we did not discuss you working events in Wayne's capacity. So I did say — I sent you an e-mail saying — reminding you of the policy. I think I forwarded you an e-mail [about the policy] that I had sent a year or two prior."). The event assignment policy required that if "anyone on the CrossPlex staff is going to work outside of their duties [during events], they have to have a post" and formally "sign up as an event worker." Doc. 37-2 at 7-8.

In addition to admitting that he informed Oates that he will no longer work events, Bowman also concedes that he "never asked to be on one of [the City's events assignment] lists" and that Oates never prevented him from signing up for a post. Doc. 33-4 at 16. Despite acknowledging the existence of the signup policy and that he had not utilized it, Bowman maintains still that Oates inconsistently applied the policy as "part of her program to deprive [Bowman] of earnings whenever she can in retaliation for his protected activity in the prior case." Doc. 42 at 29. To demonstrate the purported inconsistent application of the signup policy, Bowman maintains that he once "took note that Ricky Lee was not working in a 'post' position during the time that [Lee] was working as the maintenance supervisor during events in the Crossplex division." Doc. 47 at 10. Although Bowman is correct that the inconsistent application of a policy can be suggestive of discrimination, *see Morrison v. Booth,* 763 F.2d 1366, 1374 (11th Cir. 1985), Lee is not a proper comparator as he was in fact assigned the temporary role as maintenance supervisor which required him to work events. Doc. 47-1 at 9 (Bowman's affidavit that "Faye Oates gave . . . Ricky Lee the job duty of supervising the maintenance staff and maintenance needs for the Birmingham Crossplex department. Faye Oates made the announcement [that] Ricky Lee was supervising maintenance [during] one of the staff meetings in the summer of 2017."). As stated previously, after Lee's discharge, Oates reassigned Lee's duties

to multiple employees, including Bowman. Bowman concedes that Oates never formally assigned him the maintenance supervisor position and that she did not mention that Bowman's temporary maintenance duties included working during events. Accordingly, the purported inconsistent application between Lee and Bowman does not render the City's legitimate explanation that it was merely enforcing the assignment policy implausible or inconsistent to the degree that a reasonable fact-finder could find it unworthy of credence. *Combs*, 106 F.3d at 1543.

As to the next alleged example of an inconsistent application, Bowman contends that the City allowed him to fill in as an events manager for Sandra Brown without requiring that he utilize the events signup policy. As Bowman notes, however, the events manager, Brown, specifically asked Bowman to substitute in her place as a manager overseeing employee sign-in at events. *See* doc. 36 at 45 (Brown's deposition that "Q: Is it true that [Bowman has] worked in place of you to supervise the sign-in/sign-out process at events held throughout the Birmingham Crossplex Department? A: Yes, that's true.") and doc. 37-2 at 8 (Oates' deposition that "Q: Do you have any knowledge of me filling in for the signing supervisor, Sandra Brown? A. I do. You just reminded me of that. I know that Ms. Brown will ask you to clock people in — event staff to clock them in and clock them out when she is unable to do that duty."). In that respect, Bowman was

the *actual* events manager that day in a role that required that he work at an event. As such, his work as an events manager was outside the assignment policy which only applies to employees who "work outside of their duties [during events]" and must formally "sign up as an event worker." Doc. 37-2 at 7-8. Accordingly, this example fails to demonstrate that Oates inconsistently applied the assignment policy. *See Combs*, 106 F.3d at 1543 (noting that a potential disagreement over an employer's decision does not, without more, create a basis to disbelieve an employer's explanation).

Finally, the denial of Bowman's request a few weeks later to work on a Saturday to oversee an electrical issue with a copier, doc. 42 at 25, also does not prove retaliatory animus. Although Oates agrees that Bowman worked "with the maintenance staff and the copier vendor to try to resolve that problem," Oates contends that she did not need Bowman outside his standard work schedule on this issue because Bowman lacked electrical experience, that she had already assigned an electrician for the event, and that two other employees with temporary maintenance assignments were also scheduled to work the event. Doc. 37-2 at 16-18. Bowman does not refute these contentions and has offered no evidence to show that the two employees Oates references failed to sign up through the assignment post policy or that it was unreasonable for Oates to limit the number of employees overseeing the electrical issue. Ultimately, Bowman may only "survive

summary judgment . . . if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of *each* of the employer's proffered reasons for its challenged action." *Combs,* 106 F.3d at 1529 (emphasis added). The failure to rebut Oates' contentions dooms Bowman's claim.

To summarize, Bowman concedes that Oates only assigned him some of the duties of the maintenance role, that Oates told him to utilize the signup sheet if he wanted to work in a role beyond his normally assigned duties during events, that he never utilized the signup sheet, and that he told Oates he would no longer work any events. Moreover, Bowman has not offered any evidence that Oates allowed other similarly situated employees who did not utilize the signup sheet to work events. In short, the record does not permit the inferential leap required to conclude that Oates or the City, rather than Bowman's own failure to utilize the post assignment sheet, prevented Bowman from working at Crossplex events. Therefore, Bowman has failed to present any evidence that the City's "proffered reason is unworthy of credence or . . . that [retaliation] more than likely motivated" its decision. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991).

### *3. Overall Crossplex Manager Position and Cashier Role Assignment*

Finally, Bowman claims that the City retaliated against him by denying him an "overall" manager role and a cashier position. The City contends that it does not have a so-called "Crossplex Event Manager" position. Docs. 33-5 at 3, 46-1 at

2 (Oates' testimony that "[o]f the duties assigned [at Crossplex], I never created, nor did I ever have any knowledge of a position characterized as an overall manager position."). As to the cashier role, the City contends that it initially assigned Bowman the position at a NCAA event because it needed "all hands on deck." Doc. 37-2 at 19. Oates testified that the City asked employees "from all over the City" with "all different kinds of backgrounds" to help for events "as big as a national championship through the NCAA where [the Crossplex] was going to have thousands of people in the building," *id.* at 11*,* and that she assigned Bowman to cashier duties due to his familiarity with handling money and the Ticket Biscuit system, *id.* at 20. However, ultimately, the City rescinded the cashier assignment due to a projected decline in sales and attendance rates at the NCAA event. *Id.*

Having met its burden of producing non-retaliatory reasons for these two decisions, the burden shifts to Bowman to show pretext. Bowman has failed to do so with respect to the "overall manager" position, as he does not refute the City's contention that it has no such position: "Q: But it's your position that it's retaliation against you because [Oates is] not putting you in a role that you don't know whether or not it even exists? A. Yes, because she could have easily, when I asked her about it, said, 'Oh, no, it don't exist.' She just didn't respond, which that was curious in itself." *See* doc. 33-4 at 18. Without more, Bowman has failed to establish that the City's proffered reason is pretextual.

Bowman's claim for the cashier role assignment is also doomed by a lack of actual evidence. Bowman does not even address the City's contention that it removed him from the schedule due to lower than projected attendance to the NCAA championship. Bowman claims only that he *believes* that Oates preempted a cashier manager from asking Bowman to play a role in the event. Doc. 33-4 at 20-21 (Bowman's testimony that "[e]ven if [the cashier manager] would have or would not have, I don't know, but I think [Oates] preempted him."). This contention does not meet the City's articulated reason head on. *See Trigo,* 663 Fed. App'x at 873 (to demonstrate pretext, the employee "must meet [the employer's proffered reasons] head on and rebut it"). Moreover, such "unsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169 (11th Cir.2005) (finding that claims that are "entirely without foundation" should not be presented as triable issues of fact). Therefore, summary judgment is due on this, as well as the overall manager, claim.

## V. CONCLUSION AND ORDER

Consistent with this opinion, the City's motion to strike, doc. 41, is **GRANTED** solely as to paragraphs 15 and 17 of Bowman's November 2018 affidavit, and Bowman's motion to strike, doc. 49, is **DENIED**. Therefore, the

court **STRIKES** paragraphs 15 and 17 and the Clerk is **DIRECTED** to seal Bowman's November 2018 Affidavit, docs. 36 and 41-1.

Bowman's motion for summary judgment, doc. 35, is **DENIED**, and the City's motion, doc. 32, is **GRANTED** solely as to the retaliation claims related to the threat of termination, overall Crossplex events manager role, maintenance manager role, and cashier role assignment. Accordingly, these four claims are **DISMISSED WITH PREJUDICE.**

The pretrial conference and trial will proceed on **February 8, 2019** and **March 18, 2019** as scheduled on Bowman's remaining claim related to the written reprimand.

**DONE** the 7th day of February, 2019.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE